IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| RACHEL LANGERHANS | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Case No.: SAG-24-02994 |
| v. | * | |
| | * | |
| KIA CORPORATION, *et al.* | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff Rachel Langerhans ("Plaintiff") brings this action, on behalf of herself and all others similarly situated, against Kia Corporation and Kia America, Inc. (collectively, "Defendants") based on an alleged defect in a vehicle that they design. ECF 20. Defendants jointly filed a motion to compel arbitration. ECF 21. After considering that motion and associated briefing from both parties, ECF 25, 29[1], this Court ordered limited discovery regarding whether Plaintiff had entered into an arbitration agreement, ECF 35. After conducting such discovery, the parties filed supplemental briefing. ECF 54, 55, 56. In the alternative to their motion to compel arbitration, Defendants have also jointly filed a motion to dismiss the claims against them, ECF 22, which Plaintiff opposed, ECF 28. Defendants then jointly filed a reply. ECF 30. This Court has reviewed the filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons explained below, Defendants' motion to compel arbitration will be denied and their motion to dismiss will be granted in part and denied in part.

---

[1] Plaintiff also filed a motion for leave to file surreply in response to the motion to compel arbitration. ECF 32. Because this Court will deny the motion to compel arbitration, it will deny the motion for leave to file surreply as moot.

## I.   BACKGROUND

The following facts are derived from Plaintiff's complaint, ECF 20, and are assumed to be true for purposes of these motions.

Defendants design, manufacture, and market the 2022–2023 Kia Carnival, which features automatic sliding doors. *Id.* ¶¶ 8–9. In online advertisements cited by Plaintiff, Defendants market the Carnival as a safe option for transporting small children and market the automatic sliding doors specifically as a convenient feature. *Id.* ¶¶ 10–12. Plaintiff and her husband, Andrew Langerhans,[2] purchased a new 2022 Kia Carnival in November, 2021. *Id.* ¶ 54. The fact that this vehicle had sliding doors with a sensor to prevent the doors from closing on a person was important to them because they planned to use the vehicle with their children. *Id.* ¶ 56.

Shortly after purchasing the vehicle, Plaintiff and Mr. Langerhans noticed that the sliding doors were not reacting to obstacles, including their small children, while closing. *Id.* ¶ 57. The doors do not automatically stop closing if an obstacle is in their path; rather, an obstacle will stop one of the doors only if it has sufficient force to physically stop the door from closing. *Id.* ¶¶ 18–19. A small child might not be able to exert sufficient force to physically stop the door from closing. *Id.* ¶ 20. The pinch sensor installed in the door does not properly detect objects in the door's path and automatically stop or reverse the door from closing when an obstacle is detected. *Id.* ¶¶ 22–25. Additionally, the doors close with excessive force. *Id.* ¶ 14. The door can cause serious bodily injury if it closes on a person and squeezes the person between the door and the vehicle body. *Id.* ¶ 21. Plaintiff cites complaints from several Carnival owners reporting that their small children had been injured in this way by the automatic sliding doors. *Id.* ¶ 25.

---

[2] Mr. Langerhans was originally a plaintiff in this action in addition to his wife, but he has voluntarily dismissed his claims. *See* ECF 23, 24.

Many complaints were made about the sliding doors to the National Highway Traffic Safety Administration ("NHTSA") as well. *Id.* ¶ 47. Plaintiff alleges that Defendants either knew or should have known about this defect from several sources of information, including the complaints to the NHTSA, pre-release testing, consumer complaints, repair records from Defendant's dealers, and warranty and post-warranty claims. *Id.* ¶¶ 46–47.

Following an investigation by the NHTSA, Defendants issued a recall in April, 2023 to fix the defect in the sliding doors. *Id.* ¶ 28. In issuing the recall, Defendants acknowledged that the doors may not automatically reverse in all circumstances and may cause injury. *Id.* ¶ 29. In April, 2023, Plaintiff and Mr. Langerhans obtained Defendants' recall from an authorized dealer. *Id.* ¶ 58. During the recall, technicians examined the pinch sensors on Plaintiff's Carnival, found that they were operating correctly, and explained that they are designed to detect obstacles moving into their path from only inside, and not outside, the vehicle. *Id.* ¶¶ 59–61. Plaintiff alleges that the recall did not fix the defect because, although it caused the doors to close more slowly and make a beeping noise as they closed, it did not change the force with which the doors close or the force needed to stop or reverse the doors from closing. *Id.* ¶ 31.

Plaintiff alleges that this defect substantially diminishes the value of the vehicle compared to the value represented by Defendants. *Id.* ¶ 36. Had Plaintiff known of the defect before purchasing the vehicle, she would not have purchased it or would have paid only substantially less for it. *Id.* ¶ 45.

Plaintiff now brings several claims based on the defect and Defendants' marketing. Count I alleges breach of the implied warranty of merchantability. *Id.* ¶¶ 82–91. Count II alleges fraud. *Id.* ¶¶ 92–105. Count III alleges unjust enrichment. *Id.* ¶¶ 106–18. And Count IV alleges a violation

3

of the Maryland Consumer Protection Act ("MCPA"). *Id.* ¶¶ 119–33. Plaintiff sent Defendants notice of these claims before filing suit. *Id.* ¶ 69.

The following facts are derived from the evidence presented by the parties in support of or opposition to the motion to compel arbitration.

Shortly after Plaintiff and Mr. Langerhans purchased their Carnival, Mr. Langerhans enrolled in Kia Connect, an in-vehicle technology system that connects to a user's smartphone. ECF 21-2 ¶¶ 2, 4. To enroll, Mr. Langerhans entered his email address and agreed to the Kia Connect Terms of Service, which contain an agreement to arbitrate all claims arising out of or relating to the user's vehicle. *Id.* ¶¶ 3, 7, 10; ECF 21-5 at 29.

Plaintiff and Mr. Langerhans purchased the vehicle with the intent that it would serve as Plaintiff's primary vehicle. ECF 54-2 at 42:14–17. Mr. Langerhans estimates that he uses the vehicle about 15% of the time and Plaintiff uses it about 85% of the time. ECF 54-3 at 21:3–9. Mr. Langerhans connected his own phone to the vehicle. *Id.* at 32:20–22. He enrolled in Kia Connect because the family was going on a road trip and he wanted to be able to control the tablets in the rear seat for their daughter, but he determined that Kia Connect did not allow him to do so. *Id.* at 25:10–16.

Plaintiff and Mr. Langerhans never discussed the enrollment in Kia Connect, and Mr. Langerhans never informed Plaintiff that he had enrolled in it. *Id.* at 25:22–26:3; ECF 54-2 at 92:8–10. When he enrolled, he had no intention of Plaintiff ever using it and knew that she probably never would use it because she is not "tech savvy" ECF 55-2 at 50:7–16.

Neither Plaintiff nor Mr. Langerhans would sign up for a household service without discussing it with the other. ECF 54-2 at 91:9–11. Plaintiff would not object, however, if Mr. Langerhans signed up for a free or low-cost household service without discussing it with her first.

*Id.* at 92:19–93:16. Mr. Langerhans signed up for the free version of Kia Connect. ECF 54-3 at 32:10–12. Mr. Langerhans also handles setting up technology services that the entire family uses and has Plaintiff's permission to do so. *Id.* at 30:23–31:21.

Plaintiff has never used the Kia Connect app and, to her knowledge, has never used a Kia Connect feature. ECF 55-1 at 95:8–21. Plaintiff has used the built-in map feature in her vehicle and has seen maintenance alerts on the dashboard of the vehicle. ECF 54-2 at 60:13–14; 64:3–10. Maps are described under "Content-Based Services" and "Connected Routing" in the Kia Connect Terms of Service. ECF 21-6 at 58, 60. "Maintenance Alerts" are also described in the Terms of Service. *Id.* at 59.

## II. LEGAL STANDARDS

The parties agree that Maryland law regarding contract formation applies to this dispute. In addition to the standard requirements necessary to form a contract, Maryland law requires independent consideration to support an arbitration provision. *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 613–14 (4th Cir. 2013). Where a court finds a valid written arbitration agreement and a dispute within the scope of the agreement, it must compel arbitration. *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649–50 (1986); *Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 453 (4th Cir. 1997). The burden rests on the party seeking to compel arbitration to show that a binding contract to arbitrate exists. *Dhruva v. CuriosityStream, Inc.*, 131 F.4th 146, 151 (4th Cir. 2025).

A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of

law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).

## III.   DISCUSSION

### A. Motion to Compel Arbitration

Defendants advance several arguments that they believe warrant compelling Plaintiff to arbitrate her claims based on Mr. Langerhans's enrollment in Kia Connect. This Court will address each in turn.

### 1. Actual Authority

Defendants first contend that Mr. Langerhans acted as Plaintiff's agent in registering for Kia Connect. If an agency relationship exists, the acts of an agent may legally bind a principal. *Dickerson v. Longoria*, 414 Md. 419, 442 (2010). An agency relationship may be established through actual authority, which is created by words or conduct of the principal that reasonably cause the agent to believe that the principal wishes him to act on the principal's behalf. *Id.*

Defendants have failed to show that Mr. Langerhans acted with Plaintiff's actual authority when he enrolled in Kia Connect because they have failed to show that he acted on her behalf when he did so. Because Plaintiff is not "tech savvy," Mr. Langerhans did not intend that Plaintiff would ever use Kia Connect and knew that she probably never would. He never informed Plaintiff that he had enrolled, and Plaintiff did not know that he had. He connected his own phone, rather than Plaintiff's, to the vehicle and entered his own email address while enrolling. Most importantly, Plaintiff did not believe that she had ever used Kia Connect. Defendants counter that

she did, in fact, use Kia Connect when she used the map function and saw maintenance alerts on the dashboard. This Court is not necessarily persuaded that just because the Kia Connect Terms of Service reference the built-in map and maintenance alerts, features that Defendants do not seem to dispute are available even without enrollment in Kia Connect, that using the map or viewing the alerts constitutes use of Kia Connect. This Court will assume without deciding, however, that they do because this Court perceives the fact that Plaintiff did not *believe* that she had used Kia Connect as the relevant consideration in determining agency. The fact that Plaintiff did not believe that she had ever used a service makes it far less likely that someone else acted on her behalf in registering for it. Instead, her belief that she had never used it is consistent with Mr. Langerhans's lack of intention that Plaintiff would ever use it.

This Court is not persuaded otherwise by Defendants' argument that Mr. Langerhans had authority to enter into all free or low-cost contracts for technology services on behalf of the family, including, by implication, Plaintiff. Defendants refer to testimony that Plaintiff would not object to Mr. Langerhans enrolling in free or low-cost services and that Mr. Langerhans is generally responsible for setting up technology services that the entire family uses. This Court also notes testimony, however, that Plaintiff and Mr. Langerhans would discuss household services before signing up for them, an indication that they had an expectation that they would discuss services that the entire family would use before enrollment in them, even if Plaintiff would not object after the fact if Mr. Langerhans enrolled in a free or low-cost service without such discussion. Thus, Defendants have not presented evidence that Plaintiff caused Mr. Langerhans to reasonably believe that, without prior discussion, she wished him to enroll in free or low-cost technology services on her behalf. Furthermore, mere knowledge and failure to object does not create an agency relationship. *See Wohlmuther v. Mt. Airy Plumbing & Heating, Inc.*, 244 Md. 321, 327 (1966)

(stating that wife's knowledge of husband's intention to build on her land and failure to object does not create agency). Finally, this Court cannot conclude that Kia Connect constituted a technology service that the entire family used. Mr. Langerhans did not expect Plaintiff to ever use it, he did not inform her that he had enrolled in it, and Plaintiff did not believe that she had ever used it. Even if Plaintiff, had she known of his enrollment, would not have objected to it, Mr. Langerhans did not act on her behalf in enrolling in Kia Connect. This Court therefore concludes that Mr. Langerhans did not act with Plaintiff's actual authority.

### 2. Apparent Authority

Defendants contend that even if no agency relationship existed because of actual authority, one existed because of apparent authority. Apparent authority, which may also form the basis for an agency relationship, is created by manifestations by the principal to a third party that reasonably cause the third party to believe that the agent has authority to act on behalf of the principal. *Dickerson*, 414 Md. at 442.

Defendants argue that Plaintiff's use of Kia Connect manifested her acceptance of Mr. Langerhans's authority to enroll in it on her behalf. As an initial matter, regardless of whether her use did manifest such acceptance, this Court is not persuaded that it manifested such acceptance *to* Defendants. Defendants did not know that Plaintiff had used Kia Connect until she testified in her deposition in this case that she had used the map and seen maintenance alerts. Thus, it is not clear how any belief that Defendants might have had about Mr. Langerhans's authority to enroll in Kia Connect on behalf of Plaintiff could be traced to any manifestations that Plaintiff made to Defendants. The parties do not address this issue, but even setting this issue aside, this Court remains unpersuaded that Mr. Langerhans acted with apparent authority.

8

The parties instead focus their arguments on the Fourth Circuit's recent decision in *Naimoli v. Pro Football, Inc.*, 120 F.4th 380 (4th Cir. 2024). In that case, an individual purchased several tickets to a football game and later presented the tickets on his phone at the stadium to allow himself and several friends or relatives, including the plaintiffs, to enter the stadium. *Id.* at 383. The court concluded that the purchaser of the tickets had acted with the plaintiffs' apparent authority in purchasing the tickets. *Id.* at 388. The court determined that it was reasonable for the team to assume that a person who purchases multiple tickets to the same event does so on behalf of others. *Id.* at 387. Furthermore, by using the tickets on the purchaser's phone to enter the stadium, the plaintiffs had manifested their acceptance to the team that the purchaser had acted on their behalf in purchasing and presenting the tickets. *Id.* at 387–88. Thus, manifestations by the principals, the plaintiffs, had reasonably led the team to believe that the purchaser had acted as their agent. *Id.* at 388.

The circumstances here would not lead Defendants to the same reasonable belief about Mr. Langerhans's authority. Unlike purchasing multiple tickets to the same game, there is nothing about enrolling in Kia Connect that would reasonably lead Defendants to assume that the individual who had enrolled had done so on behalf of anyone other than himself. Furthermore, it is reasonable to assume that someone who enters a football stadium using a ticket on another person's phone accepts that that other person acted on his behalf in purchasing the ticket. In contrast, this Court cannot conclude that it is reasonable to assume that someone who uses such basic features as a map and maintenance alerts, which a reasonable user might never recognize as use of Kia Connect, accepts that someone else has enrolled in Kia Connect on her behalf. It simply is not reasonable for Defendants to assume that a person who enrolls in Kia Connect has authority to do so on behalf of every person who ever drives the car when a maintenance alert is visible on

9

the dashboard. Thus, Mr. Langerhans did not act with Plaintiff's apparent authority in enrolling in Kia Connect.

### 3. Third-Party Beneficiary

Defendants next argue that Plaintiff is bound by the arbitration agreement because she was a third-party beneficiary of it as the primary user of the car. In Maryland, an arbitration agreement does not require a third-party beneficiary of it to arbitrate a claim unless the third party is attempting to enforce the contract containing the arbitration agreement. *Dickerson*, 414 Md. at 453. None of Plaintiff's claims seek to enforce the Kia Connect Terms of Service, so even if Plaintiff were a third-party beneficiary of that contract, that status would not require her to arbitrate her claims.

### 4. Equitable Estoppel

Defendants next contend that equitable estoppel applies. Equitable estoppel precludes a party from asserting a right against another who has relied upon the asserter's conduct and changed his position for the worse. *Steele v. Diamond Farm Homes Corp.*, 464 Md. 364, 381 (2019). Defendants argue that they relied on Plaintiff's use of Kia Connect. Even putting aside the fact that, as described above, it does not appear that Defendants knew that Plaintiff had used Kia Connect until her deposition in this case, Defendants have identified no evidence showing that any possible reliance upon Plaintiff's conduct caused them to change their position for the worse. *See Dickerson*, 414 Md. at 454 (rejecting equitable estoppel argument because defendant did not identify any way in which it had changed its position for the worse). Accordingly, equitable estoppel does not apply.

### 5. The Kia Connect Terms of Service

Finally, Defendants argue that certain terms in the Kia Connect Terms of Service themselves bind Plaintiff to that contract. Specifically, the Terms of Service state, "Each time you access and/or use KIA CONNECT SERVICES, you agree to be bound by and comply with all of the terms and conditions," and the contract defines "you" to include any driver or occupant of the vehicle who uses Kia Connect. ECF 21-6 at 5. Defendants also reference the contract's requirement that each Kia Connect account holder "take efforts to educate and inform all users and occupants of your Vehicle about KIA CONNECT SERVICES and its features and limitations." *Id.* at 28.

A contract may impose obligations only on those who are parties to it. *Lake Shore Invs. v. Rite Aid Corp.*, 55 Md. App. 171, 180 (1983). Thus, a contract cannot bind non-parties merely by purporting to do so, as the Kia Connect contract does by claiming that all users of Kia Connect are bound by its terms even if they did not agree to them by entering the contract. Furthermore, although the contract may require account holders like Mr. Langerhans, who are parties to a Kia Connect contract, to inform other Kia Connect users of its limitations, that requirement cannot bind the other non-party users. Thus, the terms of the Terms of Service cannot themselves bind Plaintiff to the contract.

Because Defendants have failed to establish that Plaintiff was bound by the arbitration agreement, this Court will deny their motion to compel arbitration and will proceed to consider their motion to dismiss.

### B. Motion to Dismiss

### 1. Injury

Defendants first seek to dismiss all of Plaintiff's claims by making an argument that they frame as one of ripeness. Specifically, Defendants cite several cases for the proposition that claims

11

alleging that an extended warranty or recall is ineffective are not yet ripe if a plaintiff has failed to take advantage of the extended warranty or recall. *See* ECF 22-1 at 6. Defendants' reliance on these cases is puzzling because Plaintiff *did* take advantage of the recall here. Thus, Defendants' argument is difficult to discern, but it appears to rest on the notion that Plaintiff has not yet suffered any injury. Specifically, Defendants note that when Plaintiff brought in her vehicle for the recall, the technicians stated that the pinch sensors were operating correctly and that although Plaintiff fears that the sliding doors will injure her children, they have not yet caused any physical injury. These contentions are unpersuasive.

First, regardless of whether the pinch sensors are operating as designed, Plaintiff has alleged that that *design* is defective and that the recall did not remedy it. Specifically, she alleges that, even after the recall, the pinch sensors detect obstacles moving into their path from only inside, and not outside, the vehicle. She further alleges that the recall did not change that the doors close with excessive force and require more force than a small child might be able to exert to stop or reverse their closing.

Second, the Court of Appeals of Maryland has rejected Defendants' argument that Plaintiff must show physical injury to establish her claims. *See Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 140 (2007). In another case involving an allegedly dangerous defect in vehicle design, that court concluded that the plaintiffs had to allege only "a difference between what was expected and what was received" because of the defendants' allegedly deceptive conduct. *Id.* at 117–18, 149; *see also Singh v. Lenovo (U.S.) Inc.*, 510 F. Supp. 3d 310, 328 (D. Md. 2021) (concluding that plaintiff had adequately pled injury in form of difference between expectation of functioning vehicle feature and inoperable feature actually received). Here, Plaintiff alleges that she would not have purchased the car, or would have paid only substantially less for it, had she known of the defect. ECF 20 ¶ 45.

12

Thus, she has alleged a difference between what she expected, a car without this defect, and what she received, a car with the defect. This Court will therefore deny the motion to dismiss on this basis.

### 2. Implied Warranty of Merchantability Claim

Defendants next challenge the implied warranty of merchantability claim. Maryland has adopted the implied warranty of merchantability. Md. Code Ann., Com. Law Code § 2-314. In the automobile context, the implied warranty of merchantability warrants that a vehicle will "operate in a 'safe condition' and 'substantially free of defects.'" *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989) (quoting *Bond & Inv. Corp. v. Howard*, 9 Ill. App. 3d 348, 354 (1972)). Maryland law requires that the buyer, before filing suit, give notice to the seller of the alleged breach of this implied warranty. Md. Code Ann., Com. Law Code § 2-607(3)(a). This notice must inform the seller of the alleged breach, the particular goods that are allegedly defective, and the nature of the defect. *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 542 (D. Md. 2011).

The complaint alleges that Plaintiff sent Defendants a letter providing notice of her claims before filing suit. ECF 20 ¶ 69. Defendants do not appear to dispute receiving the notice. Instead, in their motion to dismiss, Defendants argued that this claim should be dismissed because Plaintiff had failed to attach the letter to her complaint. However, without converting a motion to dismiss into a motion for summary judgment, a court may consider, in addition to the complaint, documents attached to or incorporated into the complaint and documents "integral to and explicitly relied on in the complaint" whose authenticity is not challenged. *E.I. du Pont de Nemours*, 637 F.3d at 448 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). Thus, because Plaintiff explicitly relied on her notice letter, which is essential to one of her claims, and because Defendants have not challenged its authenticity, this Court may appropriately consider the letter.

13

In fact, Defendants appear to now acknowledge that this Court may consider the letter, arguing in their reply that the letter failed to sufficiently allege the problem with the sliding doors or Plaintiff's injury resulting from it.

The letter, which Plaintiff attaches to her opposition, describes the same problem alleged in the complaint, namely that the doors close with excessive force and fail to detect objects in their path, and describes, like in the complaint, how the recall failed to remedy this problem because it merely caused the door to close more slowly and make a beeping sound. *See* ECF 28-1. The letter also describes how the vehicle is worth less than the one that she expected to receive, an allegation that this Court has already concluded adequately alleges injury. *Id.* This Court will therefore deny the motion to dismiss on this basis as well.

### 3. Fraud and MCPA Claims

Defendants also challenge the fraud-based claims, Count II (fraud) and Count IV (violation of the MCPA). In her complaint, Plaintiff alleges under both counts that "Defendants misrepresented, concealed, and omitted material information concerning the Defect." ECF 20 ¶¶ 101, 123. Plaintiff has now explicitly disclaimed any reliance on a misrepresentation theory as to both claims. ECF 28 at 9. It appears that Plaintiff has also disclaimed reliance on a concealment theory for her MCPA claim. *See id.* (referring to the "omissions-based claim[] under the Maryland Consumer Protection Act).[3] Accordingly, this Court will examine the omission-based MCPA claim and the omission and concealment theories of the fraud claim, after first addressing the pleading standard applicable to these claims.

---

[3] To the extent that Plaintiff continues to assert a concealment theory of an MCPA violation, it fails for the reasons that her concealment theory of fraud fails, as will be explained below.

14

A party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This standard generally requires alleging the "who, what, when, where, and how of the alleged fraud." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 384 (5th Cir. 2003)). Courts have recognized, however, that this standard is ill-suited to claims of fraud based on omissions because "omissions cannot be described in terms of the time, place, and contents of a misrepresentation or the identity of the person making the misrepresentation." *Singh*, 510 F. Supp. 3d at 326. Accordingly, although the Fourth Circuit has not explicitly done so, many district courts in this circuit have adopted a relaxed pleading standard for fraud by omission claims. *See id.* (collecting cases). Under this relaxed standard, a party alleging fraud by omission must provide "'a baseline level of particularity' that rises above 'conclusory allegations of fraud.'" *Id.* at 327 (quoting *Anne Arundel Cnty. v. Xerox State & Loc. Sols., Inc.*, Civ. No. JFM-16-00563, 2016 WL 5720705, at *9 (D. Md. Sept. 30, 2016)). This Court agrees that this relaxed standard is appropriate for pleading fraud-based claims premised on omissions.[4]

a) **MCPA Claim**

Plaintiff has sufficiently pled her MCPA claim under the relaxed Rule 9(b) standard. The MCPA prohibits, in pertinent part, "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) The promotion or sale of any

---

[4] Plaintiff appears to suggest that this relaxed standard should apply to her concealment theory of fraud as well even though it is based on concealment rather than omission. This Court will assume without deciding that the relaxed standard applies to Plaintiff's concealment theory because, even under that standard, Plaintiff has failed to plead this theory for reasons that will be explained below.

consumer goods, consumer realty, or consumer service . . . ." Md. Code Ann., Com. Law Code § 13–301(9)(i). Whether a fact is material under this provision turns on whether "a significant number of unsophisticated consumers would find that information important in determining a course of action." *Green v. H & R Block, Inc.*, 355 Md. 488, 524 (1999). Materiality is ordinarily a question of fact. *Id.* Additionally, to state a claim under this provision, the plaintiff must have suffered injury or loss as a result of her reliance on the omission. *Lloyd*, 397 Md. at 143.

In *Singh*, the plaintiffs alleged that the defendant had known of a defect through several specified sources, including consumer complaints, that the defendant had failed to disclose that defect in several specified marketing materials, and that the plaintiffs would not have purchased the defective product had they known of the defect. 510 F. Supp. 3d at 326–27. The court concluded that these allegations satisfied the relaxed Rule 9(b) pleading standard for both MCPA and fraud by omission claims. *Id.*

Plaintiff's allegations here closely resemble those in *Singh*. She has alleged that Defendants knew or should have known about the defect in the sliding doors through several specified sources, such as the complaints to the NHTSA, that Defendants failed to disclose the defect through several online advertisements that she cites, and that she would not have purchased the vehicle or would have paid only substantially less for it had she known of the defect. Furthermore, at this stage, Plaintiff has sufficiently alleged that this defect was material because a reasonable factfinder could conclude that a significant number of unsophisticated consumers would consider it important whether a vehicle's automatic sliding doors might not detect obstacles in their path and close with excessive force and thereby cause serious bodily injury.

In challenging this claim, Defendants argue that an omission cannot constitute fraud absent a fiduciary relationship, which did not exist here. The Court of Appeals of Maryland has rejected

this argument, however, because the MCPA prohibits the enumerated practices, including omission of any material fact, regardless of a fiduciary relationship. *Green*, 355 Md. at 523 (reversing dismissal of MCPA claim for lack of fiduciary relationship). Plaintiff has therefore adequately pled an MCPA claim based on omission.

### b) Fraud Claim

As noted above, Plaintiff appears to still assert her fraud claim on theories of both omission and concealment. This claim requires a plaintiff to prove several elements:

> (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.

*Green*, 355 Md. at 525. Courts often refer to these elements as those of a "fraudulent concealment" claim, but the Court of Appeals of Maryland has clarified that the elements apply to a claim based on failure to disclose as well, although such claims are distinct. *Lloyd*, 397 Md. at 138 n.11. Specifically, concealment occurs when "the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from the defect," while failure to disclose "requires only that the defendant remain silent about, or omit, facts that the defendant had a duty to disclose." *Id.*; *see also Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 459 (D. Md. 2014) (noting that non-disclosure and concealment are "two similar, yet distinct, claims sounding in fraud" under Maryland law).

Plaintiff has sufficiently pled her fraud claim to the extent it is based on the omission, or non-disclosure, theory. As described above, she has sufficiently pled that Defendants failed to disclose a material fact and that she suffered damages as a result of her reliance on that non-disclosure. Moreover, Plaintiff alleges that Defendants acted with intent to defraud, ECF 20

17

¶¶ 104, 131, and the facts alleged in the complaint, that Defendants knew about the safety risk posed by the sliding doors but failed to disclose it, raise a reasonable inference of such intent. Finally, Plaintiff has sufficiently pled a duty to disclose under the Motor Vehicle Safety Act. That law requires a motor vehicle manufacturer to notify the owners of the vehicle if the manufacturer "learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety." 49 U.S.C. § 30118(c)(1); *see also Doll*, 814 F. Supp. 2d at 537 (concluding that § 30118(c)(1) imposed duty to disclose on defendant manufacturer in context of fraudulent concealment claim).

Defendants do not argue that the substance of § 30118(c)(1) would not apply to the alleged defect here. Rather, they contend that courts in this district have reached different conclusions about when a duty to disclose arises, citing *Kwintkiewicz v. Bentley Motors, Inc.*, Civ. No. WMN-10-3212, 2011 WL 1336576 (D. Md. Apr. 7, 2011), and arguing that that decision conflicts with the decision in *Doll*. In *Kwintkiewicz*, the court concluded that Maryland law does not impose a duty to disclose absent a fiduciary relationship or a partial statement of fact. 2011 WL 1336576, at *3. But whether *Maryland* law imposes such a duty does not impact whether federal law does. The court in *Doll*, in fact, recognized the circumstances under which Maryland law imposes a duty to disclose but then noted that federal law could also impose such a duty and located one in the Motor Vehicle Safety Act. *See* 814 F. Supp. 2d at 537. Thus, this Court concludes that Plaintiff has sufficiently pled a duty to disclose and a claim for fraud based on non-disclosure.

Plaintiff has failed, however, to plead a claim for fraud based on concealment. The complaint contains no allegations that Defendants "actively undert[ook] conduct or utter[ed] statements designed to, or that would, divert attention away from the defect." *See Lloyd*, 397 Md. at 138 n.11. The complaint does not, for example, allege that Defendants prevented Plaintiff from

testing the sliding doors or deflected her questions regarding them. Rather, the complaint alleges that Defendants merely never disclosed the alleged problem with the sliding doors. Thus, Plaintiff's fraud claim may proceed based on only her non-disclosure, and not concealment, theory.

## IV.    CONCLUSION

For the reasons stated above, Defendants motion to compel arbitration, ECF 21, will be denied and their motion to dismiss, ECF 22, will be granted as to Plaintiff's concealment theory but denied in all other respects. A separate Order follows.


Dated: March 17, 2026                                    _____/s/_____
                                                         Stephanie A. Gallagher
                                                         United States District Judge

19